IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2015 Session

**STATE OF TENNESSEE v. CHYANNE ELIZABETH GOBBLE**

**Appeal from the Criminal Court for Carter County**
**No. 22560     Robert E. Cupp, Judge**

_____

**No. E2014-01596-CCA-R3-CD – Filed August 12, 2015**

_____

Defendant, Chyanne Elizabeth Gobble, pled guilty to leaving the scene of an accident involving a death. The trial court denied judicial diversion and sentenced Defendant to two years' incarceration, suspending all but thirty days to supervised probation. On appeal, Defendant argues that the trial court erred in denying judicial diversion. We hold that the trial court committed an abuse of discretion in placing undue weight on an irrelevant factor. Upon our de novo review of the record, we reverse the judgment of the trial court and remand the case for entry of an order placing Defendant on diversion for a period of four years in accordance with Tennessee Code Annotated section 40-35-313.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Joshua A. Hardin, Elizabethton, Tennessee (at trial and on appeal), and C. Brad Sproles, Kingsport, Tennessee (at trial), for the appellant, Chyanne Elizabeth Gobble.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Tony Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

This is Defendant's direct appeal from the sentencing order from the Criminal Court of Carter County, denying her request for judicial diversion pursuant to Tennessee Code Annotated section 40-35-313.

Around 9:53 p.m. on September 12, 2013, while driving home after dropping off a friend, the twenty-year-old Defendant struck and killed Christopher Dale Hughes with her vehicle. Defendant did not stop. She continued to the home she lived in with her grandparents. An affidavit of complaint was issued on September 16, 2013, charging Defendant with leaving the scene of an accident involving a death in violation of Tennessee Code Annotated section 55-10-101. In General Sessions Court, Defendant waived her right to a preliminary hearing and had her case bound over to the Carter County Grand Jury. On March 3, 2014, a grand jury panel returned a no true bill on the indictment for leaving the scene of an accident involving a death. On May 5, 2014, a different grand jury panel returned a true bill on a presentment charging Defendant with leaving the scene of an accident involving a death.

On July 17, 2014, Defendant pled guilty as charged. The trial court was to determine the sentence and whether Defendant should be granted judicial diversion under Tennessee Code Annotated section 40-35-313 at a subsequent hearing. After engaging in a plea colloquy with the trial court, Defendant gave the following rendition of the facts of the case: on the night of the incident, Defendant was driving down La Vista Hill in Elizabethton, Tennessee. It was dark and raining hard that night; Defendant had on her headlights. Defendant hit something with her right front fender, became "really scared," and drove to her grandparents' house, which she approximated to be less than a mile away from the accident scene. She told them what happened, and they returned to the scene and determined that she had indeed hit a person. They then went back to her grandparents' house and called the police so Defendant could turn herself in. The police arrived within thirty minutes to an hour, and Defendant went to the hospital for a blood test.

Defendant told the trial court that she did not know who or what she had hit. The trial court asked Defendant why she did not stop. She admitted that she should have stopped but explained that she was scared that she had hit somebody. Defendant explained that there was a vehicle parked on the side of the road which made her believe that it could have been a person that she hit. Defendant then passed out during the plea hearing and had to be taken to the hospital. The hearing was rescheduled for July 24, 2014, on the issue of diversion and sentencing.

At the sentencing hearing, Defendant presented the testimony of her grandmother, Esther Gobble. Mrs. Gobble testified that Defendant's mother passed away from lupus when Defendant was fifteen years old but that Defendant did not use her mother's death

as an excuse to get into "a lot of trouble." Mrs. Gobble stated that Defendant was a good student, helped around the house, held a part-time job, and was seeking to complete her college education. Defendant graduated as an honor student from Tennessee Technology Center and was currently enrolled as a full-time student at Northeast State, where she was eligible to join the National Honor Society. Several letters from women who attended church with Defendant were entered into evidence attesting to her character. Mrs. Gobble said that Defendant had never been in any trouble before, not even a speeding ticket.

Mrs. Gobble explained that Defendant's father was in the military and that she and her husband would often care for Defendant and her mother while he was deployed. Tragically, less than two months before this incident, Defendant's father was killed in a motorcycle accident. Mrs. Gobble described Defendant as a very compassionate person and, even though she was very close to her father, she forgave the person who struck and killed her father.

When Defendant came home that evening, Mrs. Gobble could tell that she was very upset. Defendant told her grandparents that she thought she had hit something but did not know what because it was dark and pouring down rain. Defendant suggested that she might have hit an animal, such as a deer, and was upset that her car was damaged. After looking at the damage to Defendant's car, Defendant's grandfather, Robert Gobble, suggested that they return to the scene to determine what she had hit. Upon returning to the house after visiting the scene, Mr. Gobble immediately called 911 to report that Defendant wanted to turn herself in. Mrs. Gobble explained that when Defendant realized that she had hit someone, she became hysterical and started "shaking and crying uncontrollable." Mrs. Gobble thought Defendant was going into shock and put a blanket around her shoulders. Mrs. Gobble asked Defendant why she did not stop, and Defendant said that she was scared and did not know what to do.

Mrs. Gobble said that Defendant cooperated with investigators and voluntarily agreed to go to the hospital to have her blood drawn. The toxicology report was entered into evidence. Defendant's blood was drawn at 12:10 a.m., just over two hours after the accident. Defendant's blood was negative for alcohol. Defendant's statement to police was also entered into evidence.

Defendant testified that she was currently enrolled in the medical administration program at Northeast State with about a year left until she graduated. In contrast with her grandmother's testimony, Defendant admitted that she had one or two speeding tickets on her record from when she was between sixteen and eighteen years old.

With regard to the incident, Defendant testified that she had dropped off a friend in Johnson City and was driving back home along Elizabethton Highway. It was dark and raining hard that night. Defendant had on her headlights and her windshield wipers. She came to a curve near Happy Valley Cemetery and saw a car with its hazard lights on parked on the side of the road in a ditch. She had not completely passed the vehicle when she hit something with her right fender. She thought it could have been a person, but she wasn't sure. Defendant admitted that she panicked and did not slow down, but continued directly to her grandparents' house. She told her grandparents that she did not know what she had hit and thought it could have been an animal. Defendant returned to the scene with her grandfather. When they saw the ambulances, they did not stop but returned to her grandparents' house. Mr. Gobble, a retired police officer, advised Defendant to call the police.

Defendant testified that she felt miserable and that she could not believe that something like this could happen to her. She extended her condolences to the victim's family and stated that she understood what they were going through.

On cross-examination, Defendant estimated that she was driving about twenty-five miles per hour and denied that she was speeding while coming down the hill. Defendant did not remember if she tried to swerve to avoid hitting the victim but stated that the incident happened so fast that it was possible. Defendant admitted that she did not slow down. Defendant did not know there was anyone there who could render aid to the victim. She did not see a car parked on the left side of the road, only the victim's car parked in the ditch on the right side. Even though Defendant had a cell phone, she did not call 911. When Defendant got to her grandparents' house, she was upset about the damage to her car and showed her grandparents, saying that she might have hit something. Defendant explained that when she returned to the scene, she did not stop and inquire with the ambulances about the victim because she was in shock and wanted to be comforted. Defendant denied drinking or taking drugs. In response to the trial court's questions, Defendant admitted that she did not slow down when she saw the hazard lights and that she stayed in her lane the entire time.

The autopsy report for the victim was entered into evidence. Mr. Hughes was thirty-nine years old. When he was struck by Defendant's vehicle, his body was thrown about fifty feet. He died in the intensive care unit of blunt force trauma to his head and neck. Toxicology tests showed that Mr. Hughes had clonazepam and THC in his blood and an antidepressant and Suboxone in his urine. The level of THC indicated that Mr. Hughes had smoked marijuana approximately two and a half hours before his blood was drawn.

The State called Kristen Honeycutt, who witnessed the accident. She was driving with her friend Sierra Ferguson, heading toward Johnson City. Ms. Honeycutt testified that it had been raining that night and the roads were still wet, but it was not raining at the time of the accident. She saw the victim's vehicle on the opposite side of the road and thought it had wrecked, so she stopped to see if the man sitting in the vehicle was alright. Mr. Hughes got out of his vehicle and walked toward Ms. Honeycutt's car. He was standing in the right lane of travel, and Ms. Honeycutt's car was stopped in the left lane going up the hill with both her headlights and hazard lights on. Mr. Hughes told Ms. Honeycutt that he had run out of gas and needed help getting his car out of the ditch. Just as Ms. Honeycutt was standing to get out of her vehicle, a small black SUV "came out of nowhere" and ran over the victim. The SUV did not stop or slow down. Ms. Honeycutt did not see its brake lights. Ms. Honeycutt saw the victim's body thrown several feet into the ditch. Ms. Honeycutt and Ms. Ferguson ran over to the victim to render aid, and Ms. Honeycutt called 911. Ms. Honeycutt explained that the police initially thought that she had hit the victim until Defendant turned herself in. In response to the trial court's question, Ms. Honeycutt stated that she was not sure if Defendant was speeding but thought she might have been based on the impact to the victim and "the way that her car just came out of nowhere."

The State called the victim's seventeen-year-old daughter, Breanna Hughes, and his mother, Tanya Hughes, to testify about the impact that the loss of the victim has had on their family.[1] The victim had three children and an eighteen-month-old grandson. He worked as a welder and was dating an elementary school teacher. Breanna testified that, since the accident, she had suffered from PTSD, depression, and anxiety; that she had nightmares; that she was unable to drive at night; and that both she and her younger brother now go to counseling. She lamented that she will never have the opportunity to improve her relationship with her father and that he will never see her graduate, go to prom, or get married. Breanna expressed her feeling that Defendant should not be able to "just walk free" and not receive any punishment for killing someone.

Tanya Hughes testified that she was actually in the line of cars that were stopped as the rescue crews cleared the accident scene without knowing that it was her son in the ambulance. She denied that it was raining that night. She testified that there are lights along the opposite side of the road from where her son's car was parked. When she later returned to the scene with her nephew, she stated that the traffic was going fifty-five to sixty miles per hour even though the speed limit on that road is thirty miles per hour. Tanya testified that she held her son's hand as he passed away in the hospital. She stated

---

[1] Due to the witnesses having the same last name, we will refer to them by their first names for clarity. No disrespect is intended.

to the court her belief that if she were in Defendant's position and had not stopped, that she would have been put in jail that night.

During the State's closing argument, the trial court asked "Why was [Defendant] not charged with vehicular homicide?" The prosecutor responded that he was not involved in that decision-making process, to which the trial court responded, "it's almost like she got a gift already." The prosecutor suggested that proving recklessness might be difficult and that at "the most you have criminally negligent homicide," which is still an E felony and would not affect the potential sentence that could be imposed. The trial court responded, "it's troublesome to me that -- under these circumstances as I listened to them that there's not a charge of vehicular homicide."

In ruling on whether Defendant should receive judicial diversion, the trial court again stated "whether or not you could make the case on . . . vehicular homicide was a call for the State, and I don't understand why she was not charged." The trial court stated that it "didn't understand that when the [blood test] was run that it was only run on alcohol and not drugs. There's no -- I'm not saying she had anything in her system. My guess is that she didn't."

The trial court admitted that if it had known who Defendant's grandfather was, it would have recused itself from the case. The trial court stated that Mr. Gobble was a "seasoned police officer," a "good County Commissioner in this district for a long time," and an "exceptional person." However, the trial court found that he "did not do what police officers normally do" when Mr. Gobble and Defendant returned to the scene but left without talking to the police. The trial court stated, "We do things different when it's our blood, it's just a fact of life," but that "for the system to work, everybody has got to be treated the same way whoever they belong to."

The trial court then returned to the fact that Defendant was not charged with vehicular homicide:

> A decision could have been made, as it is in most cases, that -- whether or not the State has the ability to go forth on it, like it is on any case, negotiating tools. So that's concerning to me to the extent that she's already got a gift in my opinion, she's got a gift. E felony or not, that's -- there's a lot of difference in a charge of leaving the scene with death and vehicular homicide whether it's through recklessness or -- and I'm convinced this young lady had nothing in her system, she's not -- she doesn't fit that mold.

The trial court found that Defendant knew she had hit a human being based on her answers to the court's questions and her statement to the police. Based on the testimony of Ms. Honeycutt, the trial court found that it was not raining at the time of the accident. The trial court did not believe that the Defendant was only driving twenty-five or thirty miles per hour. The trial court found that Defendant was more concerned about the damage to her car and her personal need to be "comforted." The trial court found that Defendant has "been very protected," and that "[b]ecause of that, it's hard to do any wrong, to know any wrong, to accept any wrong."

In looking at the specific factors that apply to judicial diversion, the trial court first looked to the factors that weighed in Defendant's favor. The trial court found that Defendant was amenable to correction. She had a minimal criminal record—only one speeding ticket several years prior to the accident. As to Defendant's social history, the trial court found that it was good other than the fact that she has been "overly guarded." The trial court noted that "the same thing happen[ed] to her as to what happened here today" when her father was killed in an accident, so she understood what the victim's family was feeling. Defendant did not abuse drugs or alcohol. Defendant was in good physical and mental health.

The trial court found that the circumstances of the offense were "awful." The trial court stated that the victim was "slaughtered on the road." The trial court stated that it did not matter what the victim had in his system: "It wouldn't have mattered if he was drunk in the middle of the road. He had a right to live and not be run down." The trial court found that Defendant knew she hit a person but that she was more concerned with "her own well-being and that of her car." The trial court found that Defendant and her grandfather returned to the scene because she knew that she had hit a person; otherwise there would have been no reason to go back. Then they returned home and called 911 rather than talk to anyone on the scene.

As to the deterrence value, the trial court did not want to "pat [Defendant] on the head and tell her it's all right[.]" Rather, the trial court wanted to "send a message out there to the public and say, 'This conduct is not acceptable[.]'" Similarly, the trial court found that granting diversion in this case would not serve the ends of justice. The trial court again stated that the Defendant received a "gift" in being charged with leaving the scene of an accident involving a death rather than vehicular homicide, calling it "an incredible break." The trial court stated that, by denying diversion, Defendant could "explain a lot of things away" about a conviction for leaving the scene of an accident involving a death, but "[i]t's a little harder to explain away vehicular homicide." The trial court denied judicial diversion.

The sentencing hearing was continued to July 24, 2014, on the issue of sentence length and whether Defendant should serve any time in incarceration. The trial court again expressed its view that Defendant "got a racehorse deal by not being charged with vehicular homicide, she should have been, she wasn't for whatever reason." The trial court was concerned that, even though Defendant would now have a felony conviction on her record for leaving the scene of an accident involving a death, she could more easily "explain that away" than a conviction for vehicular homicide. The trial court insisted that the Defendant had been "treated different" and that anyone else "that had committed this offense under these facts" would have been arrested, yet "nothing was done to her on that vehicular homicide that she committed." The trial court found that confinement was necessary to avoid depreciating the seriousness of the offense and ordered that Defendant serve thirty days in jail and then be placed on probation for two years. Defendant requested to begin serving her thirty days the following day so that she would be able to complete them before school started.

On August 19, 2014, Defendant filed a notice of appeal. On appeal, Defendant challenges the trial court's denial of judicial diversion, arguing that the trial court failed to consider all of the appropriate factors and considered an improper factor. The State argues that the trial court did not abuse its discretion in denying judicial diversion and that the record contained substantial evidence to support the trial court's decision.

*Analysis*

When a defendant challenges the length, range, or manner of service of a sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. This same standard of review applies to the trial court's decision to grant or deny judicial diversion. *State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014).

Judicial diversion is a form of probation that affords certain qualified defendants the opportunity to avoid a permanent criminal record. *See* T.C.A. § 40-35-313(a)(1)(A). If a defendant qualifies for judicial diversion, a trial court may defer proceedings without entering a judgment of guilty, placing the defendant on probation without categorizing the defendant as a convicted felon. *Id.* Upon successful completion of the probationary period, the trial court will dismiss the charges and the defendant may seek expungement of the record, which "restore[s] the person, in the contemplation of the law, to the status the person occupied before such arrest or indictment or information." *King*, 432 S.W.3d at 323 (quoting *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999)); *see* T.C.A. § 40-

35-313(a)(2), (b).  However, if the defendant violates the terms of his or her probation, "the court may enter an adjudication of guilt and proceed as otherwise provided." T.C.A. § 40-35-313(a)(2).  "Judicial diversion is a form of 'legislative largess' available to qualified defendants who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *King*, 432 S.W.3d at 323.

A defendant is eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony, has not been previously convicted of a felony or Class A misdemeanor, has not been previously granted judicial or pretrial diversion, and is not seeking deferral for a sexual offense.  *See* T.C.A. § 40-35-313(a)(1)(B)(i).  "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *King*, 432 S.W.3d at 323.  The trial court must consider several common law factors:

> "(a) The accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others.  The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused."

*Id*. at 326 (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)).  "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." *Id*. (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id*. at 327.  Our supreme court has explained:

> Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it.  Thereafter, the trial court may proceed to solely address the relevant factors.

*Id.* Failure to consider the common law factors results in a loss of the presumption of reasonableness, and this Court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id.*

A trial court can abuse its discretion not only by failing to consider all of the relevant factors, but also by giving undue consideration to an irrelevant factor. In the context of pretrial diversion,[2] the supreme court has held that the prosecutor's consideration of and undue reliance upon an irrelevant factor constitutes an abuse of discretion. *State v. McKim*, 215 S.W.3d 781, 788 (Tenn. 2007) (holding that "[t]he prosecutor's consideration of, and emphasis upon, an irrelevant factor so tainted his decision-making process as to constitute an abuse of discretion"); *see also Stanton v. State*, 395 S.W.3d 676, 687 n.2 (Tenn. 2013). "[J]udicial diversion 'is to be imposed within the discretion of the trial court subject only to the *same constraints* applicable to prosecutors in applying pretrial diversion.'" *King*, 432 S.W.3d at 327 (quoting *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)) (emphasis added in *King*); *see State v. Cutshaw*, 967 S.W.2d 332, 343 (Tenn. Crim. App. 1997) ("Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion."). If a prosecutor can abuse his discretion by considering and placing undue weight upon an irrelevant factor in determining pretrial diversion, then it stands to reason that a trial court can likewise abuse its discretion in considering and placing undue weight upon an irrelevant factor in determining judicial diversion.

In this case, Defendant argues that the trial court considered and placed undue weight on an irrelevant factor, namely the trial court's opinion that Defendant should have been charged with vehicular homicide. Whether a trial court may consider an offense greater than that for which a defendant was indicted seems to be an issue of first impression before this Court.[3] This Court has examined and upheld a trial court's

---

[2] The difference between the two types of diversion is that judicial diversion follows a determination of guilt and the decision is made by the trial court, whereas pretrial diversion is a decision by the prosecutor to suspend prosecution for a certain period of time. *Compare* T.C.A. § 40-35-313 *with* T.C.A. § 40-15-105.

[3] In *State v. Aaron Guilliams*, No. 2013-01405-CCA-R3-CD, 2014 WL 3029844, at *1 (Tenn. Crim. App. July 2, 2014), *perm. app. denied* (Tenn. Nov. 19, 2014), the defendant was indicted for statutory rape but pled guilty to the amended charge of attempted aggravated assault. This Court noted that, in denying judicial diversion, the trial court considered that the testimony of the victim "amounted to an 'aggravated rape with someone who's unconscious'"; however, there was no further discussion of the propriety of that consideration. *Id.* at *5. This Court ultimately concluded that judicial diversion was properly denied under either an abuse of discretion or de novo standard. *Id.* at *6 n.3 (noting error with the trial court's consideration of the religious nature of the defendant's tattoo).

consideration of unindicted prior offenses, such as a defendant's admission to using illegal drugs, in considering a defendant's history of criminal behavior. *See State v. Bonestel*, 871 S.W.2d 163, 170 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000). The supreme court has also approved a trial court's consideration of other unindicted offenses that occurred during the same continuing course of criminal conduct as the charged offenses. *See State v. Lane*, 3 S.W.3d 456, 462 (Tenn. 1999). Additionally, this Court has upheld a trial court's consideration of the original indicted offense when a defendant pleas to a lesser offense. *See State v. Daniel Clarke Doyle*, No. W2012-02745-CCA-R3-CD, 2014 WL 217299 (Tenn. Crim. App. Jan. 17, 2014) (examining a situation where the defendant was indicted for statutory rape by an authority figure and pled to the lesser offense of statutory rape; the trial court considered the defendant's position of trust as a teacher at the victim's school as a factor in denying judicial diversion), *perm. app. denied* (Tenn. May 15, 2014). In this case, however, Defendant pled to the offense as charged in the indictment, yet the trial court insisted that Defendant had been given a "gift" by not being charged with the greater offense of vehicular homicide. With all due respect to the trial court, we hold this to be an abuse of discretion for the reasons explained below.

A defendant has a constitutional right to notice of the charges against him or her. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To satisfy the constitutional requirements, an indictment must provide the defendant notice of the offense charged, provide the court with an adequate basis for the entry of a proper judgment, and provide the defendant with protection against double jeopardy. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). "Inherent within these functions is the due process guarantee that the indictment provide the accused a fair opportunity to defend against the judgment." *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (citing *State v. Trusty*, 919 S.W.2d 305, 309 (Tenn. 1996), *overruled on other grounds by State v. Dominy*, 6 S.W.3d 472 (Tenn. 1999)). The importance of a defendant receiving adequate notice and having the opportunity to prepare a defense has been recognized not only in the context of the guilt phase of trial, but also during the sentencing phase. *See State v. Fields*, 40 S.W.3d 435, 440-41 (Tenn. 2001) (holding that the trial court erred in denying alternative sentencing on the basis that the drug offense occurred near a school even though the defendant was not charged with a violation of the Drug-Free School Zone Act, explaining "that even if the defendant's conduct had met the requirements necessary to invoke the School Zone Act, he would not have been given proper notice that he was being charged under this enhancement statute"); *see also State v. Harris*, 919 S.W.2d 323, 331 (Tenn. 1996) (noting that the purpose of the rule requiring notice of the prosecutor's intent to seek an enhanced sentence "is to ensure that the defense receives timely notice to enable adequate trial preparation"); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (noting that "[defense] counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases").

A constitutionally adequate indictment provides notice of the offense charged as well as all lesser-included offenses. *See Trusty*, 919 S.W.2d at 310-11; *see also* Tenn. R. Crim. P. 31(d). However, the inverse does not hold true: an indictment on a lesser offense does not provide notice of a greater offense. *See State v. Cleveland*, 959 S.W.2d 548, 552 (Tenn. 1997) (holding that a defendant cannot be convicted of an offense which is not charged in the indictment or which is not a lesser-included offense embraced in the indictment). "[A]fter an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." *Goodson*, 77 S.W.3d at 244 (citations omitted). A trial court's consideration of an offense different or greater than that for which the defendant was indicted when determining whether the defendant should receive judicial diversion offends the constitutional right to due process.

In this case, Defendant was charged with leaving the scene of an accident with a death. That was the offense listed on the affidavit of complaint, that was the offense bound over in General Sessions Court, and that was the offense that was twice presented to the grand jury. At no point in the process was Defendant ever put on notice that she would have to defend herself against a charge of vehicular homicide. In fact, the first time vehicular homicide was even mentioned was when the trial court asked the prosecutor during his closing argument at the diversion hearing why Defendant was not charged with vehicular homicide. Defense counsel had already made his closing argument and, therefore, did not have the opportunity to respond to the trial court's statements that Defendant had already been given a "gift" by being charged with leaving the scene of an accident with a death and that a conviction for this offense could be more easily explained away than a conviction for vehicular homicide. Because Defendant had no notice that the offense of vehicular homicide would be used as a consideration in determining judicial diversion, we hold that this was a violation of due process and that the trial court abused its discretion in considering it.

Additionally, the trial court's consideration of an offense it believed Defendant "should" have been charged with violates the fundamental constitutional principal of separation of powers. "District attorneys general are officers of the executive branch of government." *State v. Banks*, 271 S.W.3d 90, 155 (Tenn. 2008). "[T]he decisions of whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *State v. Gilliam* 901 S.W.2d 385, 389 (Tenn. Crim. App. 1995) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). "The prosecutor's discretion to seek a warrant, presentment, information, or indictment is extremely broad and subject only to certain constitutional restraints." *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000) (citing *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 209 (Tenn. 1999)). Thus, "as an incident of the constitutional separation of powers, the courts are not to interfere with the free exercise of this discretionary authority in [the

prosecutor's] control over criminal prosecution." *Gilliam* 901 S.W.2d at 389 (citing *Cox v. Hauberg*, 381 U.S. 935 (1965)). The trial court does not have "the right to elect which applicable statute shall be the basis of [a defendant's] indictment, subject to procedural bars and the constitutional restraints of equal protection and double jeopardy." *Id.* (citing *United States v. Batchelder*, 442 U.S. 114, 123-26 (1979)). Therefore, in addition to violating the due process right to notice, the trial court violated the separation of powers by considering an offense it believed Defendant "should" have been charged with.[4]

Furthermore, even if Defendant had been charged with vehicular homicide by conduct creating a substantial risk of death or injury to a person, she would have still been eligible for judicial diversion. Nothing about the underlying facts and circumstances of the case would have changed.[5] The fact that Defendant was involved in a motor vehicle accident and that a death resulted are already elements of the indicted offense, and "nothing exists in the record suggesting [Defendant's] conduct was aggravated in such a way that justified denying diversion because the victim died." *State v. Kyto Sihapanya*, No. W2012-00716-CCA-R3-CD, 2013 WL 6001925, at *7 (Tenn. Crim. App. Nov. 8, 2013), *reversed on other grounds by State v. Kyto Sihapanya*, -- S.W.3d --, No. W2012-00716-SC-R11-CD, 2014 WL 2466054 (Tenn. Apr. 30, 2014) (per curiam order). This Court has recently held that it is an abuse of discretion to deny judicial diversion in a reckless homicide case based solely upon the permanency of death because the legislature has not excluded reckless homicide from the offenses for which judicial diversion is available. *State v. Teresa Turner*, No. M2013-00827-CCA-R3-CD, 2014 WL 310388, at *6 (Tenn. Crim. App. Jan. 29, 2014), *no perm. app. filed*. Similarly, neither leaving the scene of an accident with a death nor reckless vehicular homicide is excluded from the offenses for which judicial diversion is available. *But see State v. Iris A. Jones*, No. M2013-00938-CCA-R3-CD, 2014 WL 4101210, at *7 (Tenn. Crim. App. Aug. 20, 2014) (holding that vehicular assault and vehicular homicide by intoxication are not eligible for judicial diversion because the lesser-included offense of driving under the influence is statutorily excluded), *no perm. app. filed*. Additionally, there is no evidence that the specific offense charged in this case would have had an effect on any of the

---

[4] We note that the district attorney had a difficult time obtaining an indictment on a charge of leaving the scene of an accident involving a death, which was presented to two different grand jury panels before a true bill was obtained. We are not convinced that there would be probable cause to support an indictment for reckless vehicular homicide in this case based upon the evidence in the record, *see* T.C.A. § 39-13-213(a)(1). The evidence does not support a charge of vehicular homicide by intoxication, *id.* at (a)(2), because Defendant voluntarily submitted to a blood alcohol test within two hours of the accident which showed that she was not intoxicated.

[5] We note that the supreme court has cautioned that "the circumstances of the offense and the need for deterrence 'cannot be given *controlling* weight unless they are of such overwhelming significance that they [necessarily] outweigh all other factors.'" *Stanton*, 395 S.W.3d at 686 (quoting *McKim*, 215 S.W.3d at 787 (emphasis and alteration in original)).

*Parker* and *Electroplating* factors.  *See King*, 432 S.W.3d at 326.  Therefore, we determine that this was an irrelevant factor for the trial court to consider even without the due process or separation of powers violations.  Undue consideration of an irrelevant factor constitutes an abuse of discretion.  *See Stanton*, 395 S.W.3d at 687; *McKim*, 215 S.W.3d at 788.

In sum, we hold that the trial court erred in considering that Defendant "should" have been charged with vehicular homicide for three reasons: it violated Defendant's constitutional due process right to notice of the charges against which she would be called to defend herself; it violated the separation of powers by questioning the charging decision of the prosecutor; and it did not affect any of the common law factors enumerated in *Parker* and *Electroplating*.  Due to the repeated references throughout the trial court's ruling to the fact that Defendant was not charged with vehicular homicide, it is clear that this irrelevant factor tainted the court's decision-making process such that the presumption of reasonableness standard is not appropriate.  *See King*, 432 S.W.3d at 327.  Therefore, we will conduct a de novo review of the record to determine whether Defendant should be granted judicial diversion.[6]

It is undisputed in this case that Defendant is eligible to be considered for judicial diversion.  She pled guilty to leaving the scene of an accident involving a death, a Class E felony.  *See* T.C.A. § 55-10-101(b)(2)(A).  Defendant has never previously received pretrial or judicial diversion.  She has no criminal record other than a speeding ticket in 2011, several years prior to the incident in this case.

Defendant's social history weighs heavily in her favor.  At twenty-one years old, she has very limited work history, but that is because she dedicated herself to her school work.  She is currently attending college to obtain a degree in medical administration.  She is an active member in her church, and several members wrote letters attesting to her character.  She suffered the tragic loss of her mother at a relatively young age, but did not use it as an excuse to get into trouble.  She also suffered the loss of her father in a motorcycle accident just two months before the accident in this case, placing her in a unique position to sympathize with the victim's family.  She has the support of her grandparents, including her grandfather who is a retired police officer, to assist her in complying with the terms of the probationary period.  Defendant does not use drugs or drink alcohol.  There is nothing remarkable about her physical and mental health, other than perhaps the fact that she passed out during the initial guilty plea hearing and the trial

---

[6] In determining whether this Court should conduct a de novo review or remand the case to the trial court for reconsideration, we must consider "the adequacy of the record, the fact-intensive nature of the inquiry, and the ability of [this] [C]ourt to request supplementation of the record." *King*, 432 S.W.3d at 328.  We believe the record in this case is adequate for a de novo review.

court's observation of Defendant being somewhat emotionless and having a "flat affect" throughout the sentencing hearing.

As to the circumstances of the offense, we acknowledge that Defendant left the scene of the accident knowing that she more than likely hit a person with her vehicle. This was a major mistake and lapse in her judgment. We also acknowledge that the victim died as a result of the injuries he sustained during the impact. However, these facts are already incorporated into the elements of the offense. *See* T.C.A. § 55-10-101(b)(2)(A) (leaving the scene of an accident is a felony "when the person knew or should reasonably have known that death resulted from the accident"). There is nothing in the record to suggest that Defendant's actions were particularly aggravated or evinced a sustained intent to violate the law. The victim was standing in the middle of the road at night when Defendant struck him. This was a tragic traffic accident that became a crime when Defendant failed to stop at the scene; her actions satisfy the elements of the offense, nothing more. Additionally, other circumstances of the offense, such as the fact that Defendant assisted the police by turning herself in and voluntarily submitting a blood sample,[7] weigh in her favor.

As to the deterrence value to Defendant and others, as well as whether diversion will serve the public interest, the trial court wanted to avoid sending a message that you can leave the scene of accident and the trial court will just "pat [you] on the head and tell [you] it's all right[.]" We agree that we should avoid depreciating the seriousness of the offense; however, we disagree that judicial diversion serves as condonation of behavior that violates the law. When a defendant is granted judicial diversion, he or she is placed on probation and must comply with all the conditions of probation, including supervision by a probation officer. Only when the defendant successfully completes probation will the charges be dismissed and the defendant can seek to have his or her record expunged. T.C.A. § 40-35-313(a)(2). If the defendant violates the terms of probation, the trial court can "enter an adjudication of guilt and proceed as otherwise provided." *Id.* Judicial diversion is not a lack of consequences for one's actions, but a one-time opportunity for

---

[7] In arguing why granting judicial diversion would not be in the public interest, the prosecutor stated, "[W]e've got a victim's side that never truly knows what was in this defendant's system at the time of the impact, because when you leave the scene and you delay going to the police, then that diminishes what might be in the system." It is true that alcohol and other intoxicants dissipate in the blood over time as the substances are metabolized by the body. However, we note that Defendant turned herself in to the police and her blood was drawn approximately two hours after the accident. This Court takes judicial notice of several DUI cases which suggest that two hours is not an unusually lengthy amount of time for a defendant's blood to be tested. *See, e.g.*, *State v. James Dean Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356 at *2 (Tenn. Crim. App. Oct. 6, 2014), *no perm. app. filed*; *State v. Charles A. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *8 (Tenn. Crim. App. Oct. 3, 2014), *no perm. app. filed*.

certain defendants to avoid a permanent criminal record. Anyone who squanders that opportunity by violating the conditions of probation will be held accountable.

We believe that judicial diversion would be a sufficient deterrent for Defendant, and others similarly situated, in light of her plans to pursue a career in the medical field. She will know that a felony conviction, should she fail to successfully complete the diversion program, would negatively impact her career plans. Additionally, we agree with the trial court's assessment that Defendant appears amenable to correction.[8] *See State v. Curry*, 988 S.W.2d 153, 157 (Tenn. 1999) (stating that in deciding whether to grant pretrial diversion, focus should be on defendant's amenability to correction). In our view, the ends of justice do not require denying judicial diversion in this case, nor do the negative circumstances of the case outweigh the many other factors in Defendant's favor. *See Stanton*, 395 S.W.3d at 686 (quoting *McKim*, 215 S.W.3d at 787).

On the whole, we fail to see how, under the circumstances of this case, adding the label of "convicted felon" to Defendant will add to the cause of justice. The facts of her youth and promising life ahead do not escape us. Giving her an opportunity to mature and demonstrate substantial and better judgment by adhering to a program of diversion will not defeat the cause of justice.

*Conclusion*

Based on the foregoing and the record as a whole, we reverse the trial court's judgment denying judicial diversion and remand the case to the trial court. The trial court shall enter an order placing Defendant on judicial diversion for a period of four years in accordance with Tennessee Code Annotated 40-35-313 under the same terms and conditions of probation as imposed by the trial court.

_____
TIMOTHY L. EASTER, JUDGE

---

[8] We note that Defendant has shown amenability to correction after the sentencing hearing when she requested to immediately begin serving the thirty days in jail rather than requesting that they be stayed pending outcome of this appeal.